CV-12-1988

SUMMONS ISSUED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ROBERT SCHROETER,

               Plaintiff,

    -against-

THE TOWN OF NORTH HEMPSTEAD, JON KAIMAN,
MICHAEL LEVINE, THOMAS MCDONOUGH, GERARD
TERRY AND RICHARD FINKEL, individually and in their
official capacities,

               Defendants.

-------------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D N Y

★   APR 2 4 2012   ★

LONG ISLAND OFFICE

COMPLAINT WEXLER, J.

Jury Trial Demanded

Plaintiff, ROBERT SCHROETER, by his attorneys, Leeds Morelli & Brown, P.C., complaining of Defendants herein, alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters:

## JURISDICTION AND VENUE

1. This is a civil action based upon Defendants, The Town of North Hempstead, Jon Kaiman, Michael Levine, Thomas McDonough, and Richard Finkel's violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution (as enforced by 42 U.S.C. § 1983), as well as any other cause of action that can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(4). The supplemental jurisdiction of the Court (28 U.S.C. § 1367) is invoked over state and local law causes of action.

1

3. Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4. Plaintiff, Robert Schroeter ("Schroeter"), was and still is a resident of Nassau County, New York.

5. Defendant, Town of North Hempstead ("North Hempstead"), was and still is a municipal corporation organized under the laws of the State of New York and located in Nassau County, New York.

6. Jon Kaiman ("Kaiman"), was and still is North Hempstead Town Supervisor. Therefore, Kaiman is North Hempstead's Chief Executive Officer responsible for North Hempstead's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment related issues. Additionally, Kaiman is a final policymaker for North Hempstead, charged with and responsible for properly training and supervising employees with respect to employment issues. Kaiman is sued in his official and individual capacities.

7. Michael Levine ("Levine") is the current Commissioner of the North Hempstead Planning and Board of Zoning and Appeals Department (the "BZA"). Therefore, Levine is responsible for BZA's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment related issues. Additionally, Levine is a policymaker for North Hempstead, charged with and

2

responsible for properly training and supervising employees with respect to employment issues. Levine is sued in his official and individual capacities.

8. Thomas McDonough ("McDonough"), is the current Safety Coordinator/ Emergency Manager for North Hempstead and is a former building inspector. Therefore, McDonough is responsible for North Hempstead's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment related issues. Additionally, McDonough is a policymaker for North Hempstead, charged with and responsible for properly training and supervising employees with respect to employment issues. McDonough is sued in his official and individual capacities.

9. Richard Finkel ("Finkel"), is the North Hempstead Town Attorney. Therefore, Finkel is responsible for advising North Hempstead's administrators regarding the maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment related issues. Additionally, Finkel is a final policymaker for North Hempstead, charged with and responsible for properly training and supervising employees with respect to employment issues. Finkel is sued in his official and individual capacities.

10. Gerard Terry ("Terry"), is the North Hempstead Special Counsel to the Board of Zoning and Appeals. Therefore, Terry is responsible for North Hempstead's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of

3

employees and all other employment related issues.  Additionally, Terry is a policymaker for North Hempstead, charged with and responsible for properly training and supervising employees with respect to employment issues.  Terry is sued in his official and individual capacities.

## FACTS

11. In September 1984, Robert Schroeter ("Schroeter") was hired by North Hempstead, as a building inspector.

12. Throughout his employment, Schroeter performed his work in an exemplary manner.

13. In 1999, Schroeter was transferred to the BZA and was responsible for inspections with the board of zoning and appeals.

14. In 2000, David Wasserman ("Wasserman") was appointed commissioner of the Building Department and within six months, he was appointed commissioner of the Planning Department.  In such capacity he had oversight of the BZA.

15. At that time, McDonough was a building inspector.

16. In February 2006, the FBI began an investigation of Department officials regarding alleged corruption.

17. During the time of this investigation, Nassau County Detective Dan Rizzo and FBI agent Gavin Shea intermittently contacted Schroeter to ask him to contact them if he finds anything relevant to their investigation.

18. In 2006, a grand jury was assembled to hear charges against Wasserman, McDonough, Andrew Acierno (former plans examiner), and Joseph Madden (former deputy commissioner).

19. In January 28, 2007, Schroeter was in a local gas station speaking with the station owner and co-worker Gene Martonik about the allegations related to the grand jury.

20. Schroeter spoke about how Kaiman pressured the building inspectors (Wasserman, and Madden) to sell fundraising tickets for the democratic party, and specifically Kaiman's campaign.

21. Chris Michelin (Kaiman's former secretary), was also present during Schroeter's conversation and overheard it.

22. Later that day, Kaiman said to Schroeter, "I heard what you said about me today. This can't be good for you, you're going to regret saying this. It must stop."

23. In April and May 2007, Schroeter testified before a grand jury regarding misconduct of Wasserman, McDonough, Acierno, and Madden

5

24. On October 15, 2007, the Nassau County District Attorney ("DA") issued charges to Wasserman, McDonough, Andrew, and Madden.

25. Subsequently, they were arrested.

26. In 2008, Schroeter came to learn about irregularities regarding building plans pertaining many buildings including, a particular building in North Hempstead known as the Granite Building.

27. Specifically, Schroeter discovered that the Granite Building owners did not pay requisite fees to North Hempstead and the building plans that were filed did not comply with North Hempstead Town Code.

28. Schroeter told Rizzo about the irregularities regarding the Granite Building.

29. On May 2, 2008, the DA issued to Schroeter a subpoena directing that Schroeter appear to testify in the matter of The People of the State of New York v. Thomas McDonough, Index No. 2357N/07.

30. Accordingly, on May 8, 2008, Schroeter appeared in Nassau County Court and gave truthful testimony regarding corruption in the Department.

31. Among other things, Schroeter testified about a citizen who complained to him about "being shaken down" by McDonough, referring to an incident where McDonough refused to issue a passing inspection unless the citizen purchased tickets to a democratic fundraising event for Kaiman.

32. In June 2008, a jury returned a not guilty verdict on McDonough and he returned to work at North Hempstead in the highway department.

33. Shortly after the verdict, McDonough stated that upon his return to North Hempstead, "heads are going to roll."

34. Additionally, McDonough called Schroeter a "rat" and a "scumbag."

35. In September 2008, North Hempstead maintenance employees entered the BZA office where Schroeter worked and put the entire contents of the office into boxes. This had never been done before in Schroeter's approximately 24 years with North Hempstead.

36. The next day Levine told the three employees who worked in the office, including Schroeter, that they were being moved from their large office into a much smaller office. The new office was 10' x 15' and not suitable for three employees. Additionally, many of Schroeter's files disappeared. Levine said the reason for the move was that Levine needed a bigger office.

37. In early 2009, Levine relocated Schroeter from his office to a cubicle and prohibited Schroeter from being present during the discussion of the reserved BZA cases, even though he had previously been allowed to attend such meetings.

38. Beginning in early 2009 and lasting into the middle of 2010, Levine denied Schroeter overtime opportunities. Other BZA employees were granted overtime opportunities.

39. In July 2009, without any warning or reason, Levine called Schroeter into his office at which time he revoked Schroeter's privilege of using a North Hempstead issued vehicle and cell phone. Levine gave no reason for such action.

40. Other employees who did not testify against North Hempstead officials were not treated in such manner nor had Schroeter been treated in such manner before he testified.

41. In 2009 and 2010 McDonough stated on several occasions, "Schroeter's gonna pay for this" and "he's gonna get fired" referring to Schroeter's testimony.

42. In November 2010, the DA subpoenaed certain records pertaining to Schroeter purchasing a house. Upon information and belief, such action was taken at the urging of North Hempstead officials, including Finkel, who alleged that Schroeter had engaged in unlawful conduct in connection with his employment.

8

43. Despite the DA's investigation into Schroeter's alleged unlawful acts, Schroeter was not charged or arrested.

44. Near the end of 2010, North Hempstead offered an early retirement incentive to its employees. Schroeter's supervisor, Eugene Martonik, accepted the early retirement incentive.

45. Soon after Martonik retired, Terry saw Schroeter in the BZA office and said to him, "What are you still doing here? Everyone thought you were going, too. We thought that you'd be out of here."

46. Also at this time, Levine told Schroeter he was no longer allowed to "call" cases for the BZA meetings and was only permitted to watch BZA meetings via closed captioned television.

47. In January 2011, Terry, required Schroeter to use the photocopy machine located in a different building instead of the machine located in his office. Terry told Schroeter the reason that he could not use the copier he had been using is because Terry did not want Schroeter "overhearing" anything and that he was "going to do anything necessary to protect his guys."

48. In early 2011, after the DA refused to further pursue the baseless allegations against Schroeter, Town Attorney Finkel issued a subpoena to Schroeter's personal architect seeking architectural drawings of a house Schroeter sold in 2005.

49. In May 2011, Finkel told Schroeter's criminal defense attorney that the DA refused to prosecute Schroeter, so North Hempstead officials "dumped" everything on him and directed that he investigate Schroeter.

50. On May 24, 2011, Finkel issued to Schroeter a letter indicating that Schroeter was suspended from his employment effective immediately and that Schroeter was required to return all North Hempstead property, including identification and keys.

51. Furthermore, Finkel instructed Schroeter that he was required to appear for questioning and that he may be subject to disciplinary action.

52. Other employees who did not testify against North Hempstead officials were not treated in such manner nor had Schroeter been treated in such manner before he testified. In fact, the alleged conduct of which Schroeter was being accused occurred years before his testimony, yet he had never before been investigated.

53. While employees who did not testify against North Hempstead officials were not mistreated, employees who did testify, such as Schroeter, faced various forms of mistreatment.

54. For example, Kevin Murray[1] was threatened that he would be reprimanded if he did not voluntarily resign so he resigned, Paul Lauria was harassed until he voluntarily resigned, and Barry Diafaria was fired. All three employees testified against North Hempstead officials.

55. All three employees indicated to Schroeter that they believed they were being followed during their field inspections and that they were being targeted for failure by North Hempstead officials.

56. Within weeks of receiving his suspension, Angelo Ferrara (North Hempstead Town Councilman) called Schroeter to tell him that he had just left Kaiman's office and that Kaiman was "out to get" Schroeter.

57. On March 15, 2012, Kaiman attended the Nassau County State of the County Address at the Cradle of Aviation Museum. Schroeter's brother, Carl Schroeter ("Carl"), also attended.

58. Kaiman approached Carl, put his hands on his shoulders, and stated, "I hope your brother is happy. Now your whole family is in trouble, he's definitely going to jail."

---

[1] Murray brought suit against North Hempstead and other individual defendants, including Kaiman and Finkel, alleging First Amendment retaliation. Murray v. Town of North Hempstead, No. 09-cv-4120 (ADS)(ARL) (E.D.N.Y.).

59. On April 5, 2012, Finkel sent to Schroeter a letter indicating that Schoeter's employment with North Hempstead was terminated, for cause.

60. The letter further indicated that disciplinary charges had been preferred against Schroeter and stated 93 baseless charges consisting of 281 inflammatory specifications, most of which dated back more than five years ago.

## AS AND FOR A FIRST CAUSE OF ACTION
### (First Amendment Retaliation)

61. Defendants, Kaiman, Levine, McDonough, and Finkel, acting under color of state law, denied Plaintiff terms, conditions and privileges of employment based on his speaking as a citizen on matters of public concern and answering questions truthfully in Court, in violation of the First Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983.

62. Defendant, North Hempstead, has while acting under color of state law, deprived Plaintiff of his constitutional rights, as secured by the First Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983. Defendant intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional right to free speech. Such deliberate indifference may be inferred in the following ways:

    a. Policymakers, such as, Kaiman, Levine, McDonough, and Finkel, engaged in and/or tacitly condoned the violation of Plaintiff's rights, as described above.

    b. Defendants maintained a policy of violating employees' First Amendment rights as

evidenced by their widespread acts of retaliation taken against, inter alia, Schroeter, Murray, Lauria, and Diafaria.

### AS AND FOR A SECOND CAUSE OF ACTION
#### (Abuse of Process)

63. Defendants, Kaiman, Levine, McDonough, Terry, and Finkel, acting under color of state law, caused the Nassau County District Attorney to investigate Schroeter without proper cause and for the ulterior motive of creating sufficient cause to terminate Schroeter's employment in violation of the Fifth and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983.

64. Further, the individual Defendants caused subpoenas to issue calling for the production of Schroeter's personal documents. Such subpoenas were issued without proper cause and for the ulterior motive of creating sufficient cause to terminate Schroeter's employment, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983.

65. Defendant, North Hempstead, has while acting under color of state law, deprived Plaintiff of his constitutional rights, as secured by the Fifth and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983. Defendant intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights. Such deliberate indifference may be inferred because policymakers, such as, Kaiman, Levine, McDonough, Terry, and Finkel, engaged in and/or tacitly condoned the violation of Plaintiff's rights, as described above.

WHEREFORE, Plaintiff demands judgment against all Defendants in the form of and/or for compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, interest, injunctive relief, and any other damages permitted by law.  Plaintiff also demands judgment against defendants for each cause action and for all applicable and permissible damages, in an amount to be assessed at the time of trial. The plaintiff further seeks injunctive relief, including but not limited to, the clearing of his personnel file of any wrongful disciplinary actions, immediate reinstatement, and a permanent injunction enjoining all Defendants and their agents from any further actions abridging Plaintiff's rights. Plaintiff further demands all attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to which Plaintiff is entitled and/or which the court deems just and proper.

Dated: Carle Place, New York
      April 18, 2012

                    LEEDS MORELLI & BROWN, P.C.
                    Attorneys for Plaintiff
                    One Old Country Road, Suite 347
                    Carle Place, New York 11514
                    (516) 873-9550

                    _____
                    RICK OSTROVE

14